12 F.3d 1101
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
SHESTOKAS DISTRIBUTING, INC. Plaintiff-Appellant,
v.
HORNELL BREWING COMPANY, INC., and United Beer Distributing
Company, Inc., Defendants-Appellees.
 No. 93-1537.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 26, 1993.
Decided Dec. 16, 1993.
 
 Before RIPPLE and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 
 ORDER
 
 1
 This is an appeal by the plaintiff, Shestokas Distributing, Inc. ("Shestokas"), from the district court's entry of summary judgment in favor of the defendants, Hornell Brewing Company, Inc. ("Hornell"), and United Beer Distributing Company, Inc. ("United Beer"). Shestokas was a distributor of United Beer's "Midnight Dragon" brand beer from March 1989 to April 1991. In June 1991, Shestokas brought this action against Hornell and United Beer for damages stemming from the defendants' failure to give Shestokas notice prior to termination pursuant to the Illinois Beer Industry Fair Dealing Act (the "Beer Act"), 815 ILCS 720/1 et. seq. Because the district court determined that no agreement existed between Shestokas and either United Beer or Hornell, it concluded that neither defendant was required to notify Shestokas prior to its termination. The district court therefore entered summary judgment in favor of Hornell and United Beer. Shestokas Distrib., Inc. v. Hornell Brewing Co., Inc. and United Beer Distrib. Co., Inc., No. 91-C3985, 1993 WL 39696, 1993 U.S.Dist. LEXIS 1718 (N.D.Ill. Feb. 12, 1993). For the reasons that follow, we affirm the district court.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 United Beer owns the rights to Midnight Dragon beer. On November 14, 1988, United Beer entered into an agreement with Hudepohl-Schoenling Brewing Company ("Schoenling") that gave Schoenling the exclusive right to manufacture, market, sell, and distribute Midnight Dragon. United Beer retained the right to distribute Midnight Dragon in New York and New Jersey. The agreement contained no provision giving United Beer any right to supervise or approve of Schoenling's selection and appointment of subdistributors. Moreover, the agreement expressly forbade either party from acting on the behalf of the other in any manner.
 
 
 4
 Pursuant to the agreement with United Beer, Schoenling began to appoint various wholesalers as subdistributors of Midnight Dragon. On March 10, 1989, Schoenling entered into an agreement with the plaintiff Shestokas to serve as a subdistributor of Midnight Dragon for a region in Chicago, Illinois. Pursuant to what Schoenling identified as the distribution agreement between Schoenling and Shestokas, Shestokas' appointment as subdistributor was to terminate if Schoenling were no longer United Beer's appointed distributor of Midnight Dragon. Shestokas, however, claims it never saw this portion of the agreement. Moreover, according to Shestokas, United Beer was involved in the original formation of the agreement between Schoenling and Shestokas. Shestokas states that, in late January 1991, before the agreement between Schoenling and Shestokas was finalized, Schoenling informed Shestokas that United Beer needed to approve the Shestokas' appointment. Further, Shestokas submits that Schoenling told it that, unless Shestokas first ordered an entire truck load of Midnight Dragon, United Beer would likely not give its approval. As a result, Shestokas states, it submitted the order. United Beer asserts that it had nothing to do with the agreement between Schoenling and Shestokas.
 
 
 5
 Following Shestokas' appointment as subdistributor in March 1989, Schoenling arranged for its subdistributors, including Shestokas, to meet United Beer's officials in New York in August 1989 in order to observe United Beer's approach to marketing Midnight Dragon in New York and New Jersey. In connection with these visits, United Beer suggested that Schoenling recommend that each of its subdistributors hire someone to promote Midnight Dragon fulltime, and that Schoenling split the costs with each of its subdistributors. Schoenling and Shestokas did so, and United Beer allowed Schoenling to reduce its monthly royalty payment to United Beer to help defray the costs. However, United Beer never required Shestokas to hire the employee, and Shestokas never billed United Beer for any part of his salary.
 
 
 6
 The distribution relationship between Schoenling and Shestokas continued until February 1991, at which time United Beer and Schoenling decided to terminate their agreement. Both agreed that Schoenling would cease manufacturing and distributing Midnight Dragon on April 1, 1991. United Beer later determined to assign the right to manufacture Midnight Dragon to G. Heileman Brewing Company and the right to distribute it to Hornell, United Beer's sister company. Therefore, on February 28, 1991, Schoenling informed Shestokas and its other subdistributors that, because Midnight Dragon would no longer be a part of Schoenling's operations, its subdistributors should contact United Beer or Hornell if they wished to continue to serve as a subdistributor of Midnight Dragon.
 
 
 7
 Shortly thereafter, Mr. David Shestokas, Shestokas' principal, contacted United Beer's Mr. John Ferolito about Shestokas' desire to remain a distributor of Midnight Dragon. However, Mr. Ferolito informed Mr. Shestokas that he should contact Mr. Robert Corsetti of Hornell. On March 11, 1991, Mr. Corsetti sent Shestokas a letter regarding a possible distribution agreement and the appropriate forms for Shestokas to complete. The forms were to be returned by April 1, 1991; however, Shestokas did not return them until April 8. After Mr. Corsetti visited Shestokas' operations and found the place at a standstill, he declined to accept any of Shestokas' orders. On June 10, 1991, Mr. Corsetti informed Shestokas of his decision not to appoint it as a Midnight Dragon distributor. On June 26, 1991, Shestokas filed a complaint alleging that, under the Illinois Beer Act, Hornell failed to give Shestokas proper statutory notice prior to its termination as subdistributor. Shestokas later added United Beer as a defendant in its first amended complaint.
 
 B. District Court Proceedings
 
 8
 In the district court, Shestokas moved for summary judgment, and the defendants, Hornell and United Beer, moved to dismiss the complaint pursuant to Rule 12(b)(6). However, because Hornell and United Beer presented matters outside the pleadings to the court, the district court converted their motion to dismiss to a motion for summary judgment. See Fed.R.Civ.P. 12(b). It then turned to the issue of whether, owing to United Beer's alleged control over the distribution agreement between Schoenling and Shestokas, United Beer and Shestokas had an implied agreement under the Act. The agreement, Shestokas submitted, gave United Beer a statutory duty to give Shestokas notice prior to its termination as subdistributor. However, the district court determined that the evidence failed to support the existence of a genuine issue of whether an implied agreement existed between United Beer and Shestokas.
 
 
 9
 The district court determined that, in assigning its distribution rights, United Beer had given the responsibility of selecting distributors to Schoenling, which had contracted independently with various subdistributors, such as Shestokas. The district court was not persuaded that the purported indicia of control offered by Shestokas to show that United Beer actually controlled the relationship between Schoenling and Shestokas presented a genuine issue of triable fact. The court stated that Shestokas' submissions, such as the assertion that Schoenling had told Shestokas that United Beer had to approve it as a subdistributor, or that Shestokas had to buy a certain quantity of Midnight Dragon before it could become a subdistributor, could not, on the record presented, be tied to United Beer. None of the representations, the court noted, came from United Beer itself. Moreover, the agreement between United Beer and Schoenling made clear that neither party had the authority to make representations for the other.
 
 
 10
 In the alternative, Shestokas argued that the March 12, 1991 letter to Shestokas from Hornell constituted an offer to enter into a new distributorship. The letter stated in part that "Heileman is ready to accept your orders for production in accordance with their ordering policies, when they are advised by Hornell that you have been appointed as our Distributor." The district court held that the letter was not an offer to enter into a contract but rather at most an invitation to deal. Moreover, the court stated that, even if the letter had been an offer, Shestokas' failure to complete and submit the forms enclosed with the letter before the given deadline constituted a counteroffer that Hornell declined to accept. The district court thus entered summary judgment in favor of United Beer and Hornell.
 
 II
 ANALYSIS
 
 11
 On appeal, Shestokas presents two issues for review. First, Shestokas submits that Hornell was a "successor brewer" under the Beer Act and therefore had to give Shestokas statutory notice before its termination as subdistributor. The district court never addressed this issue. However, Shestokas did properly raise the issue in the district court and thus preserved it for appeal. Second, Shestokas submits that a genuine issue of material fact exists as to whether United Beer was a "master distributor" under the Beer Act because of the control it exerted over the distribution agreement between Schoenling and Shestokas. We shall address each issue in turn. Because Shestokas appeals from a grant of summary judgment, we review the district court's decision de novo, drawing all reasonable inferences from the record in favor of Shestokas. See Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir.1993) (citations omitted). However, before we address the issues Shestokas presents, we first shall set out the statutory provisions of the Beer Act relevant to those issues.
 
 
 12
 A. The Illinois Beer Industry Fair Dealing Act
 
 
 13
 The Illinois legislature enacted the Beer Act "to promote the public's interest in fair, efficient and competitive distribution of malt beverage products by regulation and encouragement of brewer and wholesaler vendors to conduct their business relations toward these ends." 815 ILCS 720/2(A). To further these goals, Sec. 720/3 of the Act provides that certain parties must give notice before terminating a beer distribution agreement:
 
 
 14
 Termination and Notice of Cancellation. (1) Except as provided in subsection (3) of this Section,[1] no brewer or beer wholesaler may cancel, fail to renew, or otherwise terminate an agreement unless the brewer or wholesaler furnishes prior notification to the affected party in accordance with subsection (2).
 
 
 15
 (2) The notification required under subsection (1) shall be in writing and sent to the affected party by certified mail not less than 90 days before the date on which the agreement will be cancelled, not renewed, or otherwise terminated. The notification shall contain (a) a statement of intention to cancel, failure to renew, or otherwise terminated an agreement, (b) a complete statement of reasons therefore, including all data and documentation necessary to fully apprise the wholesaler of the reasons for the action, and (c) the date on which the action shall take effect.
 
 
 16
 * * *
 
 
 17
 Although Sec. 720/3 plainly states that the Act requires notice prior to termination in particular situations, we must refer to the Act's definitions to determine when such situations are present. Specifically, we need to examine the definition of an "agreement" and the definition of a "brewer."
 
 
 18
 The Act's definitions are found in Sec. 720/1.1 of the Act. An "agreement"
 
 
 19
 means any contract, agreement, or arrangement, whether expressed or implied, whether oral or written, for a definite or indefinite period between a brewer and a wholesaler pursuant to which a wholesaler has been granted the right to purchase, resell and distribute any brand or brands of beer offered by a brewer. The agreement between a brewer and wholesaler shall not be considered a franchise relationship.
 
 
 20
 Sec. 720/1.1(2). Further, a "brewer" is any beer manufacturer, "master distributor," or "successor brewer." A "master distributor"
 
 
 21
 means a wholesaler who acts in the same or similar capacity as a brewer or outside seller of one or more brands of beer to other wholesalers on a regular basis in the normal course of business.
 
 
 22
 Sec. 720/1.1(5). In turn, a "successor brewer"
 
 
 23
 means any person who obtains the right of a brewer or master distributor to manufacture or distribute a brand or brands of beer whether by merger, purchase of corporate shares, purchase of assets, or any other arrangement.
 
 
 24
 Sec. 720/1.1(6). These schematic definitions of the terms "agreement" and "brewer" are at the core of Shestokas' arguments, to which we now turn.
 
 B. Application
 1.
 
 25
 Shestokas submits that, when Hornell succeeded Schoenling as the master distributor of Midnight Dragon on April 1, 1991, Hornell became a "successor brewer" under the plain language of the Beer Act's "successor brewer" provision. As such, Shestokas claims that Hornell violated Sec. 720/3 of the Act by not giving Shestokas the required statutory notice before failing to renew its appointment as subdistributor. Shestokas asserts that the "any other arrangement" language in the Act's definition of "successor brewer" includes the circumstances in this case by which Hornell came to be the new distributor of Midnight Dragon. Because there is no caselaw on the issue, Shestokas asks that we look to one of the purposes of the "successor brewer" provision to support its argument. Shestokas submits that the legislature included the provision in part to prevent those who are considered "brewers" under the Act from circumventing the notice requirement merely by transferring their distribution rights to another company. Otherwise, Shestokas argues, a company could circumvent the Act simply by setting up a shell corporation to which it could assign its distribution rights--which, according to Shestokas, is essentially what took place in this case.
 
 
 26
 In essence, Shestokas submits that Hornell is the "successor brewer" to Schoenling because Hornell now has the right to distribute Midnight Dragon that Schoenling once had. We cannot accept this construction of the statute. The statute requires that we focus not on whether Hornell now has a right to distribute that Schoenling once had, but rather whether the manner in which Hornell obtained that right makes it a "successor brewer." The Act states that the replacement distributor is a "successor brewer" only if it obtains the previous distributor's rights "by merger, purchase of corporate shares, purchase of assets, or any other arrangement." Thus, the statutory language confirms Shestokas' observations on one of the purposes of the provision; the language does prevent companies from circumventing the Act's notice requirement by means of corporate formalities. However, we do not have such a situation before us. United Beer and Schoenling mutually agreed to terminate their distribution agreement on April 1, 1991. Upon termination, Shestokas lost its right to distribute Midnight Dragon through Schoenling or anyone else. United Beer subsequently assigned the rights to distribute to Hornell. Schoenling and Hornell did not engage in any transaction whatsoever, much less a transaction contemplated by the statute. The statutory language clearly contemplates a transaction between the brewer (Schoenling) and the successor brewer through the purchase of stock or assets or "any other arrangements." We agree with Hornell and United Beer that this latter phrase must be read, in accordance with the statutory rules of ejusdem generis and noscitur a sociis, as describing a similar transaction between the brewer and its replacement. Thus, Hornell was not Schoenling's "successor brewer" under the statute. Indeed, we note that under the interpretation Shestokas' urges us to adopt, the definition of "successor brewer" in the statute would be entirely unnecessary. Instead, the legislature simply could have stated that any person who in any way obtains the distribution rights that a "brewer" under the Act once had is a "successor brewer." Needless to say, that is not how the Illinois legislature wrote the "successor brewer" provision, and that is not how we read it. See Antunes v. Sookhaktich, 588 N.E.2d 1111, 1115 (Ill.1992) (stating that a court should construe a statute so as to give it a reasonable meaning and prevent absurdity); City of Rolling Meadows v. Kyle, 494 N.E.2d 766, 769 (Ill.App.1986) (stating that a court must construe a statute in a way that makes it logical, useful, and reasonable).
 
 
 27
 Shestokas also submits that, in applying the "successor brewer" provision, the district court erroneously considered a document that Schoenling stated was part of the distribution agreement between Schoenling and Shestokas. The document stated that the distribution relationship between the two would last only as long as Schoenling retained its rights as master distributor under United Beer. Shestokas argues that, because Mr. Shestokas has stated under oath that the document was not part of the agreement between Schoenling and Shestokas, the district court should not have determined whether it actually was part of the agreement. Although Shestokas may be correct in pointing out that the issue is one of disputed fact, the issue's ultimate resolution is of no import to the question of whether Hornell is a "successor brewer" under the Act. The issue is not one of material fact. See Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). Rather, whether the document was part of the agreement between Schoenling and Shestokas goes only to whether Schoenling improperly failed to give notice under the statute prior to terminating Shestokas as its subdistributor. But Schoenling's compliance with the Act's notification requirement as a brewer is not at issue in this lawsuit--Hornell's status as a "successor brewer" is.
 
 
 28
 In short, Hornell did not become a "successor brewer," and thereby a "brewer," under the statutory language by mere virtue of becoming a distributor of Midnight Dragon. It thus did not have to give Shestokas statutory notice before it decided not to retain Shestokas as a subdistributor of Midnight Dragon.
 
 2.
 
 29
 Shestokas also submits that a genuine issue of material fact exists as to whether United Beer was a "master distributor" in relation to Shestokas under the Act. Shestokas states that United Beer was so involved in the distribution relationship between Schoenling and Shestokas that it was a "master distributor" in relation to Shestokas. For support, Shestokas offers representations that Schoenling made to Shestokas about United Beer's involvement in the distribution relationship between Schoenling and Shestokas. Mr. Shestokas, for example, testified that Schoenling informed him and his company that United Beer would have to approve of Shestokas' appointment as a subdistributor of Midnight Dragon. Moreover, Mr. Shestokas also stated that Schoenling notified him that, in order for Shestokas to get the subdistributorship, United Beer insisted that Shestokas make a substantial purchase of Midnight Dragon even before any agreement was consummated.
 
 
 30
 Shestokas' "master distributor" argument encounters definitional problems at the onset. Shestokas never even attempts to explain how the various facts that its claims are in dispute could make United Beer a "master distributor" under the Beer Act. We recognize the extreme scarcity of caselaw on these provisions of the Beer Act, and even on the Beer Act in general; however, Shestokas fails even to deal with the language of the definition of "master distributor" in the statute.[2] If we were to assume that this initial hurdle could be surmounted, we would next address whether a genuine issue of material fact exists regarding an implied agreemen between United Beer and Shestokas.[3] If such an agreement existed, United Beer would have owed Shestokas statutory notice under the Act prior to its termination as subdistributor. Shestokas has presented many examples concerning the amount of control it claims United Beer exerted over Shestokas' distribution agreement with Schoenling. However, like the district court, we find no basis for the existence of an implied agreement between United Beer and Shestokas. Assuming, arguendo, the absence of any evidentiary problems, Shestokas' reliance on representations Schoenling made to it concerning United Beer's participation in the distribution relationship between Schoenling and Shestokas is misplaced. Without some evidence that United Beer approved of Schoenling's representations, we cannot attribute them to United Beer, particularly when the agreement between United Beer and Schoenling expressly stated that neither party had the authority to represent the other.[4] The fact that Shestokas officials discussed pricing with United Beer officials on visits to New York does not raise the relationship between the two to the level of contract, implied or otherwise. Similarly, Shestokas' attempt to import great significance to a single peculiar letter that United Beer's Mr. Ferolito supposedly wrote to Mr. Shestokas is unpersuasive. The May 8, 1990 letter threatened to revoke Schoenling's, and thus Shestokas', right to distribute Midnight Dragon if sales did not improve. However, the letter was neither signed nor written on United Beer letterhead. Moreover, the letter was not sent to Shestokas by United Beer, but rather by Schoenling.
 
 
 31
 More fundamentally, even if we were to assume all that Shestokas asks us to assume with respect to adjudicative facts, we see nothing that would trigger the protection of the Act. United Beer, as the owner of the brand rights for Midnight Dragon, acted well within its rights in working with a master distributor such as Schoenling in attempting to promote the product. Therefore, for instance, even assuming that Mr. Ferolito allowed Schoenling to send the letter threatening termination, the letter does not show that United Beer was acting under an agreement with Shestokas. Rather, it reveals only that United Beer allowed Schoenling to use its name to let Shestokas know that, if sales did not improve, United Beer had the power to terminate Schoenling, which in turn meant the end of the subdistributorship agreement between Schoenling and Shestokas.
 
 
 32
 The record on summary judgment will not support a reasonable inference that United Beer and Shestokas had an implied agreement within the purview of the Beer Act. Thus, United Beer owed Shestokas no duty to notify it in accordance with the statute prior to termination. Rather, Schoenling and Shestokas were the parties to Shestokas' distribution agreement, and it is to Schoenling, if to any party, that Shestokas should have looked for the notice it never received prior to its termination as subdistributor of Midnight Dragon beer.
 
 Conclusion
 
 33
 For the foregoing reasons, we affirm the judgment of the district court.
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 Subsection 3 sets forth situations in which the statute does not require notice before termination. None of those situations is relevant to the case before us
 
 
 [2]
 Under Sec. 720/1.1(5) of the Act, a "master distributor" is "a wholesaler who acts in the same or similar capacity as a brewer or outside seller of one or more brands of beer to other wholesalers on a regular basis in the normal course of business."
 
 
 [3]
 In relevant part, Sec. 720/1.1(2) of the Act provides that an "agreement"
 means any contract, agreement, or arrangement, whether expressed or implied, whether oral or written, for a definite or indefinite period between a brewer and a wholesaler pursuant to which a wholesaler has been granted the right to purchase, resell and distribute any brand or brands of beer offered by a brewer.
 
 
 [4]
 Shestokas asserts that, because this case is at the summary judgment stage, we must assume Mr. Shestokas' testimony to be true. However, Shestokas is mistaken in stating that we therefore must assume that, for instance, United Beer directly approved of Shestokas' appointment as subdistributor. To the contrary, we need assume only that the facts introduced in Shestokas' affidavits are true, which means that we must assume that Schoenling actually represented to Shestokas that United Beer had to approve its subdistributorship. See Visser v. Packer Eng'g Assoc., Inc., 924 F.2d 655, 657 (7th Cir.1991) (stating that a court must assume the facts in a nonmovant's affidavits to be true on a motion for summary judgment). In other words, we need not assume that Schoenling's representations are true