OPINION OF THE COURT
Gloria M. Dabiri, J.
By notice of motion, dated July 2, 1998, plaintiff South End Distributing Corporation (South End) seeks an order, pursuant to CPLR 3212, granting it summary judgment as to liability and scheduling the matter for trial as to damages. Plaintiff contends that defendant’s answer fails to raise a defense to liability under Alcoholic Beverage Control Law § 55-c. Defendant Hornell Brewing Company Inc. (Hornell) maintains that termination of its at-will relationship with South End did not violate section 55-c, and opposes the motion.
BACKGROUND
In 1988 Hornell, a licensed manufacturer and importer of malt beverages, and South End, a licensed beer wholesale distributor, commenced a business relationship pursuant to which South End was assigned certain territories in the New York City area in which to market and deliver Hornell’s malt beverage and soft drink products. Hornell filled orders placed with it by South End, and South End paid for the products and resold them in these territories. The specific territories and types of products distributed varied from time to time. However, the distribution agreements were not reduced to writing.
In August of 1997 Hornell terminated its distributorship relationship with South End. Thereafter, in January of 1998, South End commenced the instant action against Hornell, pursuant to section 55-c (6) of the Alcoholic Beverage Control Law, for improper termination of its distribution right in defendant’s malt beverage products. South End seeks damages in the amount of lost profits and a permanent injunction restoring its arrangement with Hornell. By answer and counterclaim, Hornell contends that in accordance with Alcoholic Beverage Control Law § 55-c, it terminated South End’s distribution *578 rights for nonpayment of moneys due. Hornell maintains that the terms of its invoices require payment within 30 days of shipment. Hornell seeks $124,360.08 in payment for products delivered to South End, interest and costs. In response to the counterclaim South End alleges that $110,000 is owed to it in credits and rebates, and that Hornell has refused to accept the return of $40,000 in inventory. South End argues that during their 10-year business relationship Hornell had accepted South End’s practice of making late payment. South End argues that, because Hornell did not timely post credits and rebates to South End’s account, late payment was necessary in order to avoid overpayment.
DISCUSSION
The issues raised by the instant motion for summary judgement are: (a) whether the parties’ oral agreement to distribute Hornell’s malt beverage products falls within the ambit of section 55-c of the Alcoholic Beverage Control Law and (b) if so, whether Hornell was required to give South End notice and an opportunity to cure prior to termination of their distributorship arrangement.[1]
Section 55-c of the Alcoholic Beverage Control Law,[2] effective September 25, 1996, governs commercial relationships between brewers and malt beverage wholesalers engaged in the distribution of such products in New York State. The law requires that distribution agreements between brewers and beer wholesalers entered into after the statute’s enactment, and renewals of existing agreements, be in writing and that the writing set forth all essential and material terms, requirements, standards of performance and conditions of the business relationship. Termination, nonrenewal or material alteration of agreements by brewers require “good cause”, as defined by statute, notice to the wholesaler and an opportunity to cure. Only in certain situations, such as the revocation or *579 suspension of a license or permit, an assignment for the benefit of creditors or fraudulent conduct, can an agreement be terminated without notice.
A private right of action for violation of this statute is created by subdivision (6) of section 55-c. A beer wholesaler may maintain a civil action for damages based upon a brewer’s failure to comply with the law’s provisions. In any legal action challenging cancellation, termination or failure to renew, the brewer has the burden of proving that its action was based upon “good cause”. However, the wholesaler retains the burden of proof in all other respects.
South End is a “licensed wholesale distributor of beer” in New York State (see, Ayala affidavit ffl[ 2, 3). Hornell is a “distributor and marketer of malt-liquor” which sold beer to South End for resale in New York (see, Adonailo affidavit 2, 3). Thus, South End is a “beer wholesaler” and Hornell is a “brewer” within the statute’s definitions of those terms (Alcoholic Beverage Control Law § 55-c [2] [d], [b]).[3]
Subdivision (3) of section 55-c, entitled “Written agreement required”, provided in relevant part as follows: “Except as provided for in subdivision ten * * * beer offered for sale in this state by a brewer to a beer wholesaler shall be sold and delivered pursuant to a written agreement which conforms to the provisions of this section * * * Such agreement may be cancelled, terminated, materially modified or not renewed for good cause as defined in this section, provided the brewer has acted in good faith.” (Emphasis supplied.) Subdivision (10) (a) exempts from the statute’s coverage only those written agreements in effect prior to the effective date of the statute “which set forth all terms and conditions of material significance governing the relationship between the brewer and beer wholesaler”, including “termination of the relationship”. However, the requirements of subdivision (3), nevertheless, apply to “any agreement entered into, and renewals, extensions, amendments or conduct constituting a material modification of an agreement on or after the effective date of this section” (Alcoholic Beverage Control Law § 55-c [10] [a]).
Oral agreements existing prior to the statute’s effective date, and written agreements which do not meet the requirements of subdivision (10) (a), are addressed by subdivision (10) *580 (b), which states: “Where an agreement between a brewer and beer wholesaler in effect prior to the effective date of this section is continuous in nature or has no specific duration or has no renewal provision and fails to set forth all terms and conditions of material significance governing the relationship * * * such agreement shall be considered for purposes of this section to have been renewed sixty days after the effective date of this section.” (Emphasis supplied.) The term “agreement” is defined by subdivision (2) (a), as “any contract, agreement, arrangement, course or dealing or commercial relationship between a brewer and a beer wholesaler pursuant to which a beer wholesaler is granted the right to purchase, offer for sale, resell, warehouse or physically deliver beer sold by a brewer.” (Emphasis supplied.) Thus, an oral agreement or “a course of dealing” existing prior to the effective date of section 55-c and having “no specific duration” or “renewal provision” is considered to have been renewed 60 days after the statute’s effective date. Such preexisting oral agreements thereby were brought within the ambit of section 55-c 60 days after September 25, 1996.
As previously noted, agreements within the reach of section 55-c require good cause, notice and an opportunity to cure prior to cancellation. In this regard subdivision (4) (a) provided: “No brewer may cancel, fail to renew [or terminate] an agreement unless the party intending such action has good cause * * * and in any case in which prior notification is required under this section, the party intending to act has furnished said prior notification * * * and [the wholesaler] has failed to cure such defaults or deficiencies”. “Good cause” for termination is defined by subdivision (2) (e) (ii)[4] as: “a failure by the beer wholesaler to comply with a material term of an agreement required by subdivision three * * * provided that: (A) the wholesaler was given written notice by the brewer of the failure to comply with the agreement * * * (B) the wholesaler was afforded a reasonable opportunity to assert good faith efforts to comply * * * (C) the wholesaler was afforded * * * days * * * to submit a * * * plan of corrective action”. And, subdivision (5) (a), entitled “Notice of default or deficiency”, read: “[ejxcept as provided in paragraph (d) of this subdivision, no brewer may cancel, fail to renew or terminate an agreement unless the brewer or beer wholesaler furnished prior notification in accordance with * * * this subdivision.”
*581 Thus, the termination or nonrenewal of the parties’ oral distribution agreement required “good cause”, “notice” and an opportunity to cure unless an exception, found in paragraph (d) of subdivision (5), was applicable. Paragraph (d) reads in relevant part:
“A brewer or beer wholesaler may cancel, fail to renew or otherwise terminate an agreement without furnishing the prior notification required under this section only * * *
“(v) in the event of the failure by either party to pay sums of money to the other party when due or if either [the wholesaler or brewer] takes any action [which would provide grounds] for immediate termination pursuant to the [reasonable] terms of a written enforceable agreement [between them, which was freely entered into without threat of termination or other coercion or compulsion and was in full force and effect sixty days from the effective date of the chapter of the laws of nineteen hundred ninety-seven which amended this subparagraph]” (emphasis supplied).
Hornell maintains that South End failed to pay sums of money to it when due and that, pursuant to subdivision (5) (d) (v), no notification prior to cancellation was required. The question raised by Hornell’s interpretation of clause (v) is whether the language “failure by either party to pay sums of money to the other” is restricted by the phrase “pursuant to the [reasonable] terms of a written enforceable agreement [between them]”. A review of the rules of statutory construction and of the legislative history of section 55-c leads to the conclusion that it is.
“The use of a comma before the disjunctive ‘or’, in construing a sentence in a statute, ordinarily indicates an intention to discriminate the first half of sentence from the second half’ (McKinney’s Cons Laws of NY, Book 1, Statutes § 253). The absence of a comma following “when due” and preceding “or if’, therefore, suggests that the phrase, “pursuant to the [reasonable] terms of a written enforceable agreement [between them]”, also applies to the first portion of clause (v).
Moreover, a reading of the statute in its entirety and consideration of its legislative history warrants the same conclusion. The opening paragraph of section 55-c declares it to be the policy of New York State “that the sale and delivery of beer by brewers to beer wholesalers shall be pursuant to a written agreement.” (Alcoholic Beverage Control Law § 55-c [1].) Subdivision (3) requires that the written agreement set forth “all essential and material terms, requirements, standards of performance and conditions of the business relation *582 ship between a brewer and a beer wholesaler”. And, subdivision (10) (a) exempts only written agreements in effect prior to the effective date of the statute “which set forth terms and conditions of material significance * * * including * * * (i) termination of the relationship”. In signing section 55-c into law the Governor in his memorandum noted: “In approving this bill New York joins more than thirty other states which have in place similar laws governing the relationship between brewers and franchised beer wholesalers * * * the bill protects and provides to beer wholesalers * * * written agreements and a concomitant recognition of both the value-added function performed by beer wholesalers and of the legitimate and significant interest that beer wholesalers acquire in the brands of brewers. While the bill is imperfect and has several technical flaws, it is necessary to level the playing field between brewers and beer wholesalers.” (Governor’s Mem approving L 1996, ch 679, 1996 McKinney’s Session Laws of NY, at 1927.)
Thereafter, by chapter 612 of the Laws of 1997, section 55-c was amended to, inter alia, reduce the period for notice and opportunity to cure and to address limited partnership agreements involving national brewers (Alcoholic Beverage Control Law § 55-c [2] [e] [ii]; [4] [a]; [9] [a], [b], [c]). While subdivision (5) (d) (v) was also amended by the 1997 law, this amendment simply added language requiring that the “reasonable” terms of the enforceable agreement, relied upon to terminate an agreement without notice, have been “freely entered into without threat of termination or other coercion or compulsion and was in full force and effect sixty days from the [law’s] effective date”. Notably, the supporting memorandum to Senate bill 5743 (enacted as L 1997, ch 612) reflects that the amendment “set[s] forth what is required in a written agreement between a brewer and a beer wholesaler and further provides for the termination of such an agreement”. (Mem of Senate in Support, 1997 McKinney’s Session Laws of NY, at 2584 [emphasis supplied].)
Finally, any other interpretation of section 55-c would permit parties to easily thwart the intention of the law, by simply failing to enter into written agreements (cf., Glazer Wholesaler Drug Co. v Heineken USA, 1995 WL 753052 [US Dist Ct, ED La, Dec. 18, 1995, Sear, Ch. J.]).
CONCLUSION
Thus, the court concludes that while nonpayment may form the basis for immediate termination of a brewer-wholesaler *583 agreement without the statutorily required notice and opportunity to cure, such termination must occur pursuant to the reasonable terms of a written agreement which complies with the requirements of section 55-c (3).
On a motion for summary judgment the “proponent * * * must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case” (Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853; Scala v Veit, 253 AD2d 551; CPLR 3212 [b]). When the proponent has made a prima facie showing sufficient to entitle it to summary judgment, it is incumbent upon the opposing party to show by evidentiary facts that the defense is real and can be established on a trial (Indig v Finkelstein, 23 NY2d 728). Conclusory allegations, even if believable, are insufficient to defeat summary judgment (Amatulli v Delhi Constr. Corp., 77 NY2d 525, 533; McGahee v Kennedy, 48 NY2d 832, 834). In this case, Hornell has failed to demonstrate by evidentiary facts that in terminating its distribution agreement with South End it complied with the written notice and opportunity to cure provisions of section 55-c.
Accordingly, it is ordered that plaintiffs motion for summary judgment as to liability on its first cause of action is granted, and it is further ordered that plaintiffs motion is otherwise denied, and it is further ordered that upon completion of discovery, pursuant to the preliminary conference order of January 15, 1999, the matter be scheduled for trial (1) as to damages on plaintiffs first cause of action, (2) on plaintiffs second cause of action for injunctive relief, and (3) as to liability and damages on defendant’s counterclaims.

. Hornell has not raised the defense of Statute of Frauds (CPLR 3211 [el; 3018 [b]; Schaffer Stores Co. v Grand Union Co., 84 AD2d 614, appeal dismissed 56 NY2d 570; Chester Natl. Bank v Rondout Mar., 46 AD2d 985, Iv denied 37 NY2d 706; Blechner v Pecoraro, 164 AD2d 878, 879).
Such a defense even if asserted would fail on its merits (see, UCC 2-201 [3] [b]; 2-204 [1]; 2-207 [3]; General Obligations Law § 5-701 [b] [3] [c]; Hornell Brewing Co. v Spry, 174 Mise 2d 451) since Hornell concedes the existence of an oral distribution agreement (see also, Gaultney-Klineman Art v Hughes, 227 AD2d 221, 222, Iv denied 92 NY2d 802).

. Section 55-c was enacted by chapter 679 of the Laws of 1996. It was amended by chapter 612 of the Laws of 1997, effective September 17, 1997.

. Alcoholic Beverage Control Law § 55-c (2) (b) was amended, effective September 17, 1997, to define a brewer as any person engaged “primarily” in business as a manufacturer of “alcholie beverages” or as a marketer of same.

. This section was amended in September of 1997 to, inter alia, reduce the period for cure from 30 to 15 days.