JRC Beverage, Inc. v K.P. Global, Inc. (2024 NY Slip Op 00067)

JRC Beverage, Inc. v K.P. Global, Inc.

2024 NY Slip Op 00067

Decided on January 10, 2024

Appellate Division, Second Department

Chambers, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on January 10, 2024
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

COLLEEN D. DUFFY, J.P.
CHERYL E. CHAMBERS
LINDA CHRISTOPHER
BARRY E. WARHIT, JJ.

2021-01286
 (Index No. 611041/19)

[*1]JRC Beverage, Inc., etc., appellant,
v
K.P. Global, Inc., et al., respondents.

APPEAL by the plaintiff, in an action, inter alia, to recover damages for violation of Alcoholic Beverage Control Law § 55-c, from an order of the Supreme Court (James Hudson, J.), dated December 22, 2020, and entered in Suffolk County. The order, insofar as appealed from, granted those branches of the defendants' motion which were for summary judgment dismissing the causes of action to recover damages for tortious interference with contract, violation of Alcoholic Beverage Control Law § 55-c, and unfair competition, and denied the plaintiff's cross-motion for summary judgment on the issue of liability on the cause of action to recover damages for violation of Alcoholic Beverage Control Law § 55-c.

Schwartz Ettenger, PLLC, Melville, NY (Jeffrey S. Ettenger of counsel), for appellant.
Vishnick McGovern Milizio, LLP, New Hyde Park, NY (Jordan M. Freundlich of counsel), for respondents.
Tannenbaum Helpern Syracuse & Hirschtritt, LLP, New York, NY (Andre R. Jaglom, Vincent J. Syracuse, and Rosa Guerrero of counsel), for amicus New York State Beer Wholesalers Association.

CHAMBERS, J.

OPINION & ORDER
We are asked on this appeal to determine whether section 55-c of the Alcoholic Beverage Control Law obligates a beer importer, which acquired its importation rights relating to a particular beer brand directly from the manufacturer, to honor a wholesale distribution agreement entered into by the prior importer of the same beer brand. Additionally, we note that this appeal presents a question of first impression.
We conclude that the generous protections afforded to beer wholesalers under Alcoholic Beverage Control Law § 55-c extend to circumstances such as the present one, and obligate an importer to honor a wholesale distribution agreement entered into by the prior importer of the same brand, even where, as here, there is no relationship or privity of contract between the prior importer and the new importer. For the reasons that follow, under the specific language of New York's law, the defendant importer in this action is a "successor to a brewer" within the meaning of Alcoholic Beverage Control Law § 55-c, and the plaintiff wholesaler has demonstrated as a matter of law that the defendant importer failed to honor, without good cause, the wholesale distribution agreement entered into by the plaintiff and the prior importer.
Factual and Procedural Background
The plaintiff is a beer wholesaler that purchases various brands of beer from different [*2]brewers and then sells that beer to retailers. BWS Group Co. (hereinafter BWS) previously acted as a United States importer for various brands of beer produced by the Oriental Brewery Company (hereinafter OBC), a brewery in South Korea. By appointment letters dated October 28, 2015, and January 1, 2017, BWS appointed the plaintiff as the exclusive distributor of several brands of OBC beer in New York.
Subsequently, OBC notified BWS of its intention to cancel their import and export agreement as a result of an alleged breach of the terms by BWS. OBC then entered into a replacement import and export agreement with the defendant K.P. Global, Inc. (hereinafter KP). KP, in turn, entered into an agreement with the defendant Northern Beverage, Inc. (hereinafter Northern), for Northern to act as the exclusive distributor of OBC beer in New York.
Thereafter, the plaintiff commenced this action, alleging, among other things, that the appointment of Northern as the exclusive distributor of OBC beer in New York was in violation of the plaintiff's rights under Alcoholic Beverage Control Law § 55-c. The plaintiff seeks, inter alia, to recover damages from KP for violation of Alcoholic Beverage Control Law § 55-c, and to recover damages from both KP and Northern for tortious interference with contract and unfair competition. The defendants moved for summary judgment dismissing the complaint, and the plaintiff cross-moved for summary judgment on the issue of liability on the cause of action to recover damages for violation of Alcoholic Beverage Control Law § 55-c. By order dated December 22, 2020, the Supreme Court, among other things, granted those branches of the defendants' motion which were for summary judgment dismissing the causes of action to recover damages for tortious interference with contract, violation of Alcoholic Beverage Control Law § 55-c, and unfair competition, and denied the plaintiff's cross-motion. The plaintiff appeals.
Principles of Statutory Construction
In matters of statutory construction, our primary consideration is to discern and give effect to the intent of the Legislature (see People ex rel. E.S. v Superintendent, Livingston Corr. Facility, 40 NY3d 230, 235; Patrolmen's Benevolent Assn. of City of N.Y. v City of New York, 41 NY2d 205, 208). The plain text of a statute is the clearest indicator of legislative intent (see Bank of Am., N.A. v Kessler, 39 NY3d 317, 324; Lubonty v U.S. Bank N.A., 34 NY3d 250, 255), and "[t]he literal language of a statute is generally controlling unless the plain intent and purpose of a statute would otherwise be defeated" (Matter of Anonymous v Molik, 32 NY3d 30, 37 [internal quotation marks omitted]). "'[T]he legislative history of an enactment may also be relevant and is not to be ignored, even if words be clear'" (People v Badji, 36 NY3d 393, 399, quoting Riley v County of Broome, 95 NY2d 455, 463). "In a manner consistent with the text, we may look to the purpose of the enactment and the objectives of the legislature" (Lubonty v U.S. Bank N.A., 34 NY3d at 255; see Bank of Am., N.A. v Kessler, 39 NY3d at 324).
The court "must also interpret a statute so as to avoid an unreasonable or absurd application of the law" (Lubonty v U.S. Bank N.A., 34 NY3d at 255 [internal quotation marks omitted]; see Bank of Am., N.A. v Kessler, 39 NY3d at 324). "'[A] statute must be construed as a whole and . . . its various sections must be considered with reference to one another'" (James B. Nutter & Co. v County of Saratoga, 39 NY3d 350, 355, quoting Matter of Albany Law School v New York State Off. of Mental Retardation & Dev. Disabilities, 19 NY3d 106, 120). In addition, remedial statutes should "be construed broadly so as to effectuate their purpose" (Matter of Scanlan v Buffalo Pub. School Sys., 90 NY2d 662, 676; see Nelson v HSBC Bank USA, 87 AD3d 995, 998).
Statutory Text
Thus, when interpreting Alcoholic Beverage Control Law § 55-c, which governs commercial relationships between brewers and beer wholesalers (see Garal Wholesalers v Miller Brewing Co., 193 Misc 2d 630, 632 [Sup Ct, Suffolk County]; South End Distrib. Corp. v Hornell Brewing Co., 179 Misc 2d 576, 578 [Sup Ct, Kings County]), we first turn to the text as the best evidence of the Legislature's intent. First, subdivision (1) begins with a statement of purpose, as follows:
"It is hereby declared to be the policy of this state, that the sale and delivery of beer by brewers to beer wholesalers shall be pursuant to a written agreement. That further, the regulation of business relations between brewers and beer wholesalers is necessary and appropriate to the general economy and tax base of this state and in the public interest" (Alcoholic Beverage Control Law § 55-c[1]).
Subdivision (4)(a), in turn, states that "[n]o brewer may cancel, fail to renew, or [*3]terminate an agreement unless the party intending such action has good cause for such cancellation, failure to renew, or termination" (id. § 55-c[4][a]).
Subdivision (2)(e)(i) and (ii) limits good cause to a narrow set of circumstances (see id. § 55-c[2][e][i], [ii]).
Subdivision (2)(a) sets out the definition of an "agreement" as "any contract, agreement, arrangement, course of dealing or commercial relationship between a brewer and a beer wholesaler pursuant to which a beer wholesaler is granted the right to purchase, offer for sale, resell, warehouse or physically deliver beer sold by a brewer" (id. § 55-c[2][a]).
Further, subdivision (2)(b) expressly states that the definition of "brewer" includes both a beer manufacturer and beer importer, as well as other types of entities, "who sells or offers to sell beer to a beer wholesaler in this state" (id. § 55-c[2][b]). The definition of brewer also expressly includes "any successor to a brewer" (id.).
Subdivision (2)(c) sets forth the definition of a "successor to a brewer" as:
"[A]ny person or entity which acquires the business or beer brands of a brewer, without limitation, by way of the purchase, assignment, transfer, lease, or license or disposition of all or a portion of the assets, business or equity of a brewer in any transaction, including merger, corporate reorganization or consolidation or the formation of a partnership, joint venture or other joint marketing alliance" (id. § 55-c[2][c]).
Finally, as relevant to this appeal, subdivision (6) states that a beer wholesaler may maintain a civil action to recover damages if a brewer fails to comply with the provisions of the statute (see id. § 55-c[6]).
Legislative History
Next, we survey the legislative history of Alcoholic Beverage Control Law § 55-c and the succession of reforms, which were intended to afford protections to beer wholesalers. In 1996, the Legislature enacted section 55-c (see L 1996, ch 679, § 1). In his approval memorandum, Governor George E. Pataki stated that the bill "protects and provides to beer wholesalers what many other franchise owners in our State already enjoy: written agreements and a concomitant recognition of both the value-added function performed by beer wholesalers and of the legitimate and significant interest that beer wholesalers acquire in the brands of brewers" (Governor's Approval Mem, Bill Jacket, L 1996, ch 679 at 13). Governor Pataki noted that the law was "necessary to level the playing field between brewers and beer wholesalers" (id.). The law was intended to "strengthen the three-tier system of beer distribution in our State," "composed of brewer, wholesaler and retailer," which "has produced a beer market characterized by competitive pricing, ease of entry and constant product innovation" (id.).
As proffered by its sponsors, the purpose of the legislation was "to provide a more equitable framework for the business dealings between beer brewers and importers and their wholesalers" (Senate Introducer's Mem in Support, Bill Jacket, L 1996, ch 679 at 17-18). In explaining the need for the legislation, the introducer's memorandum stated, "[w]holesalers expend considerable time, money and effort in building equity in the brands they sell," and the legislation was intended to protect wholesale distribution agreements from "arbitrary termination" (id. at 18). The memorandum expressed a specific concern about importer practices, noting that "[w]hile most major suppliers currently market their products pursuant to equity agreements, many importers in particular require their designated wholesaler to operate under oral agreements that are effectively terminable by [the importers] at will" (id.).
Similarly, those who lobbied either in favor of or against the legislation were concerned about what they perceived as imbalances in the bargaining power among different participants in the beer industry, arising from discrepancies in market share. Those who wrote in support of the legislation described the concerns of small family-owned beer wholesalers whose agreements were being arbitrarily terminated by large national beer manufacturers (see Bill Jacket, L 1996, ch 679 at 60-61, 122-132). Those who opposed the legislation spoke of the lack of protection for small local beer manufacturers (see id. at 10, 11, 26, 51, 53, 106, 108, 110). In signing the bill into law, Governor Pataki acknowledged the concerns expressed by small brewers and expressed a commitment to monitoring the legislation's implementation (see id. at 14).
Later, in 1997, the Legislature amended the statute to shorten the cure period for wholesalers who had been served with notification of a brewer's intent to cancel a distribution [*4]agreement due to the wholesaler's deficiencies in performance (see L 1997, ch 612, § 1). According to a letter written by the Senate sponsor, the bill redressed the concerns of "many small brewers [who] fear[ed] that during th[e original longer cure period] they will be forced to continue to deal with an under-performing beer wholesaler and thus will suffer a diminished market share" (Letter from Senator Meier, Bill Jacket, L 1997, ch 612 at 7). The 1997 amendments also afforded brewers a limited right to terminate a distribution agreement with reasonable compensation where the wholesaler has received a loan from a competing brewer or entered into a limited partnership with a competing brewer, under certain narrow circumstances (see Alcoholic Beverage Control Law § 55-c[9][c]; L 1997, ch 612, § 4). The Senate sponsor noted that "[b]rewers in our State fear that large brewers may be tempted to provide loans to beer wholesalers contingent on the elimination of smaller brands" (Letter from Senator Meier, Bill Jacket, L 1997, ch 612 at 7). These amendments were intended to "provid[e] protection for New York brewers from national brewers who [ ] make an attempt to eliminate the market share of small brewers" (id.).
In 2001, the Legislature revisited the subject matter of strengthening protections for beer wholesalers by specifying and narrowing the circumstances under which a brewer may terminate a beer wholesaler agreement in the context of a business consolidation plan (see L 2001, ch 346, § 1). In approving the bill enacting the 2001 amendment, Governor Pataki stated that the impetus for the amendment was to "ensure that New York's beer wholesaler franchise law serves its intended purpose of protecting beer wholesalers from bad faith terminations, without unreasonably inhibiting the ability of brewers to conduct business in this State" (Governor's Approval Mem, Bill Jacket, L 2001, ch 346 at 3). Likewise, the sponsors of the 2001 amendment stated that the original law was "enacted in recognition of the basic disparity of bargaining power between large suppliers that dominate today's marketplace and their wholesaler partners—who for the most part remain family owned community based business within the state" (Introducer's Mem in Support, Bill Jacket, L 2001, ch 346 at 4). The sponsors commented that the statute was originally designed to ensure that a brewer's consolidation plan "must truly be multi-state in its implementation" and must be pursued "as a matter of business necessity rather than merely advantageous" in order to qualify as a good cause to terminate a wholesaler relationship (id.). However, some brewers had construed the language of the statute in a "subjective manner that g[ave] them limitless discretion" (id. at 5). "[C]onsistent with the original intent of the statute, th[e] amendment w[ould] simply protect wholesalers from . . . purely subjective, arbitrary and retaliatory terminations" (id.). Importantly, in response to a then recent trial court's interpretation of the statute, which had "brought about a result unintended by the Legislature," another purpose of the bill was to make clear "that the provisions of [section] 55-c were not intended to preclude courts from granting preliminary relief prior to a final determination of the 'ultimate merits'" (id. at 4)[FN1]. The bill would also "ensure that [a] terminated wholesaler must be paid as a condition to the actual termination, which ends the wholesaler's cash flow from the affected brand and allows the brewer and its favored replacement to 'free ride' on the existing wholesaler's investment and equity" (id. at 5). As noted above, these amendments provided that a "beer wholesaler may maintain a civil action in a court of competent jurisdiction" within New York (Alcoholic Beverage Control Law § 55-c[6]; L 2001, ch 346, § 3). The amendment sought to "further the statute's original purpose by providing beer wholesalers access to venue in courts within the state of New York" (Coors Brewing Co. v Oak Beverage, Inc., 549 F Supp 2d 764, 770 [ED Va]).
In 2012, the law was again amended, to allow small brewers, defined as those comprising less than 3% of a beer wholesaler's business and producing less than 300,000 barrels a year, the right to terminate agreements with beer wholesalers without "good cause," provided they pay the wholesaler fair compensation (Alcoholic Beverage Control Law § 55-c[4][c][i]; L 2012, ch 367, § 1; see Introducer's Mem in Support, Bill Jacket, L 2012, ch 367 at 12). This amendment again reflected the concern that smaller local businesses were at a competitive disadvantage in a beer industry dominated by large national corporations. Pertinent to the particular circumstances [*5]presented here, the introducer's memorandum stated that the original purpose of section 55-c, when it was passed in 1996, was to protect beer wholesalers, "which were smaller local and often family owned businesses," from "arbitrary termination by large multi-national breweries" (Introducer's Mem in Support, Bill Jacket, L 2012, ch 367 at 12). Since the law's enactment, "[t]here has been significant consolidation in the beer wholesaler industry," such that the number of wholesalers have diminished and those who remain "have considerable resources and have gotten much bigger" (id.). "At the same time," the memorandum noted, "the number of smaller independent breweries in New York State has grown tremendously," but "the opportunity for growth for many small brewers is restricted because of contracts that require them to exclusively do business with a particular wholesaler that is not actively supporting or selling their brand" (id.). It was "never the intention of the Law to be used by the wholesaler to lock small breweries into a relationship" (id. at 13).
Next, we evaluate the arguments advanced by the parties in light of the plain language of the statute, its legislative history, and the overall objective of the legislation.
Analysis
Successor to a Brewer
Against this legislative backdrop, we turn to the core of this appeal—whether the term "successor to a brewer," as defined under section 55-c(2)(c) of Alcoholic Beverage Control Law, includes a beer importer who acquired its importation rights directly from a beer manufacturer, rather than from a prior importer. The plaintiff wholesaler contends that an importer who acquires its rights in this manner, as the defendant KP did in this case, is included within the meaning of "successor to a brewer," because the importer has "acquire[d]" the "beer brands of a brewer," and this is all that the statute requires (id.). The defendants contend that KP cannot be considered a "successor to a brewer" because KP did not acquire its importation rights from the prior importer and it was not in privity of contract with the prior importer or with the plaintiff wholesaler.
Although existing case law does not squarely address whether a beer importer acquiring importation rights directly from a beer manufacturer, rather than from a prior importer, is a successor to a brewer within the meaning of the statute (see id.), the defendants' contention that the statute requires contractual privity between the prior importer and the replacement importer was previously raised, but not reached, in an action commenced in the federal district court for the Eastern District of New York (see Amtec Intl. of NY Corp. v Beverage Alliance LLC, 2011 WL 13244183, *5 [ED NY, No. 10CV1147 (NGG) (SMG)]).
Further, a handful of other state and federal courts have confronted factually analogous circumstances, and have been called upon to interpret other states' statutes governing the sale of beer or wine. While these other courts have generally favored the position of the importer over that of the wholesaler, their determinations turn heavily upon the specific language of the state statutes at issue (see Country Vinter of North Carolina, LLC v E & J Gallo Winery, Inc., 461 Fed Appx 302, 306-308 [4th Cir] [interpreting NC Gen Stat §§ 18B-1205 and 18B-1213, and comparing prior version of statute to recently amended statute, which expanded scope of law to cover a "successor to the import rights of a winery"]; Guinness Import Co. v Mark VII Distributors, Inc., 153 F3d 607, 610-612 [8th Cir] [interpreting Minn Stat Ann §§ 325B.01-325B.14, and concluding that a new importer was not the "purchaser" of a brewer within meaning of statute]; Shestokas Distrib., Inc. v Hornell Brewing Co. Inc., 12 F3d 1101, *4-5 [7th Cir] [interpreting 815 Ill Comp Stat 720/1.1(6), and concluding that only certain transaction types qualify an entity as a successor brewer]; Grant Importing & Distrib. Co. v Amtec Intern. of N.Y. Corp., 384 Ill App 3d 68, 69-72 [App Ct Ill] [same]; Cavalier Distrib. Co. v Lime Ventures, Inc., 2023 WL 2384440, *7, 2023 US Dist LEXIS 38420, *19 [SD Ohio, No. 1-22cv121] [interpreting Ohio Rev Code §§ 1333.82-1333.87, and concluding that the beer distributor seeking a preliminary injunction had not shown substantial likelihood of success on the merits, as Ohio law "could be understood as creating franchise obligations only against the party or parties that select(s) the Ohio distributors"]).
Here, based upon the specific language of New York's statute, we conclude that the plaintiff's position is correct. Contrary to the defendants' contention, nothing in the definition of "successor to a brewer" requires privity of contract between the successor and the entity it is succeeding. And notwithstanding the defendants' arguments to the contrary that the statute necessarily contemplates that the business would be acquired from the brewer, the statute is devoid of any indication that a successor brewer must acquire a brewer's business from the brewer itself.
Had the Legislature intended to include a requirement of privity of contract between outgoing and incoming brewers, it could have easily included restrictive language in the statute to [*6]that effect. Instead, the definition of successor to a brewer provides that a successor may acquire the "business or beer brands" of a brewer "in any transaction," and does not limit with whom the transaction must take place (Alcoholic Beverage Control Law § 55-c[2][c]). Although a list of specific methods of acquisition is provided, the list is qualified as being "without limitation," indicating that the list is not exhaustive (id.; see generally Bank of Am., N.A. v Kessler, 39 NY3d at 325). Under these circumstances, we decline to presume a restriction that the Legislature failed to include in the statute. Here, in a transaction between KP and the beer manufacturer, OBC, KP acquired the importation rights previously held by the prior importer, BWC. We, therefore, conclude that KP is a successor to the prior importer under the plain language of the statute.
While many states have similar laws protecting wholesale distribution agreements, New York's statutory scheme is particularly broad. In some instances, states permit a successor brewer to terminate a wholesale distribution agreement entered into by the brewer it is succeeding, as long as the successor brewer pays reasonable compensation to the wholesaler (see e.g. Warren Distrib. Co. v InBev USA L.L.C., 2010 WL 2326168, *1, 2010 US Dist LEXIS 55542, *4 [D NJ, Civ. No. 07-1053 (RBK/JS)] [interpreting NJ Stat Ann § 33:1-93.15]; Pabst Brewing Co. v Frederick P. Winner, Ltd., 478 Md 61, 68-69, 272 A3d 324, 328-329 [interpreting MD Code § 5-201[d][2]). New York, by contrast, makes clear that a successor to a brewer is bound by an agreement with a beer wholesaler to the same extent as a brewer (see Alcoholic Beverage Control Law § 55-c[2][b]). The intended broad reach of New York's law is also reflected in its express inclusion of the term "importer" within the definition of brewer (cf. Tippecanoe Beverages, Inc. v Heineken USA, Inc., 406 F Supp 2d 1033, 1037 [ND Ind] [interpreting Ind Code § 7.1-5-5-9, and concluding that brewer and importer are separate and distinct entities and not interchangeable]), and the use of the term "acquire" instead of a narrower method of acquisition, such as "purchase," to describe the manner in which a successor to a brewer may obtain a brewer's business (cf. Country Vintner of North Carolina, LLC v E & J Gallo Winery, Inc., 461 Fed Appx at 306-308).
Moreover, we agree with the state and federal courts that have characterized Alcoholic Beverage Control Law § 55-c as remedial in nature (see Garal Wholesalers v Miller Brewing Co., 193 Misc 2d at 637-639; John G. Ryan, Inc. v Molson USA, LLC, 2005 WL 2977767, *3-4, 2005 US Dist LEXIS 42973, *8-14 [ED NY, No. 05CV3984 (NGG) (JMA)]; see also Amtec Intl. of NY Corp. v Beverage Alliance LLC, 2011 WL 13244183, *2). Both the statute's language and its legislative history reflect that the primary purpose of the law was to protect the economic stability of beer wholesalers, who were perceived to be at a bargaining disadvantage vis-à-vis large beer manufacturers and importers. While we acknowledge that the statute is not a model of clarity, given its remedial nature, it should be construed to effectuate the legislative purpose of protecting beer wholesalers from the cancellation or nonrenewal of their wholesale distribution agreements without cause (see Matter of Scanlan v Buffalo Pub. School Sys., 90 NY2d at 676; Nelson v HSBC Bank USA, 87 AD3d at 998).
The legislative history of the statute focuses on addressing power imbalances among different actors in the beer industry, arising because different actors control different amounts of market share. Absent from the legislative history are concerns such as those expressed by the defendants, namely, that they had no prior relationship with the plaintiff or BWS, the prior importer, that they were strangers to the original transaction, and that they never chose this wholesaler themselves. The concerns raised during debate of the law related not to infringements on freedom of contract for its own sake, but rather potential abuses by wholesalers. For example, when brewers expressed concerns about being locked into agreements in which a wholesaler was ignoring their product in favor of larger brewers that offered more potential for profit, those concerns were addressed in amendments shortening the necessary cure period prior to good-cause terminations, and again in a later amendment to create an exception for small craft brewers to the good-cause requirement for termination. Each of these amendments addressed small craft brewers' concerns that they could not compete against large national brewers. The Legislature has never made any changes to the law to protect brewers from inheriting the burdens of agreements they did not originally wish to enter, such as the defendant importer in the case at bar.
The same concern for domination of the market by large national and multinational manufacturers is reflected in New York's adoption of the three-tiered system for beer distribution, comprised of manufacturers, wholesalers, and retailers (see e.g. Granholm v Heald, 544 US 460, 466; Arnold's Wines, Inc. v Boyle, 571 F3d 185 [2d Cir]; John G. Ryan, Inc. v Molson USA, LLC, 2005 WL 2977767, *3-4, 2005 US Dist LEXIS 42973, *8-14). This three-tiered beer distribution [*7]system is found in the law of most states (see generally Brian D. Anhalt, Comment, Crafting a Model State Law for Today's Beer Industry, 21 Roger Williams U L Rev 162, 171-173 [2016]). "Separating retailers from other tiers was a response to the desire of lawmakers, at the time Prohibition ended, to end the presence of 'tied houses' and vertical integration (and, thus, the prospect of monopolies) by brewers and to advance the cause of temperance" (Drew Thornley, Opening the Taps of Freedom to Distribute Alcohol: An Overview of State Alcohol Regulation in the United States and Recommendations for Reform, 52 U Pac L Rev 821, 825 [footnote omitted; 2021]). "Tied houses, which were common in the U.S. before Prohibition, were drinking establishments that sold a certain alcohol producer's drinks exclusively, in exchange for the financial incentives offered by the producer to the establishment" (id. [footnote omitted]). Thus, laws prohibiting tied houses and the development of the tiered system of beer distribution arose from a "distrust of domination of the alcohol industry by a few companies" (Justin M. Welch, Note, The Inevitability of the Brewpub: Legal Avenues for Expanding Distribution Capabilities, 16 Rev Litig 173, 179 [1997]; see Michael B. Newman & Jason H. Barker, Retying the House: How the Evolution of Prohibition Era Alcohol Beverage Laws Has Facilitated A Generation of Independent Craft Brewers, 12 Buff Intell Prop LJ 159, 162 [2018] [discussing the problems historically associated with tied houses]).
Some sources have characterized New York as having a de facto four-tier system, because entities such as importers of foreign beers, contract brewers serving microbreweries, and local subdistributors sometimes serve as intermediaries between beer manufacturers and wholesalers (see State of New York by Abrams v Anheuser-Busch, Inc., 811 F Supp 848, 852 [ED NY]; Daniel J. Adams Mem in Opposition, Bill Jacket, L 1996, ch 679 at 30-31; Letter in Opposition from Empire State Beer Distributors Association, Inc., Bill Jacket, L 1996, ch 679 at 102). However, even where, as here, four actors are involved in the chain of beer delivery from manufacturer to consumer, the application of Alcoholic Beverage Control Law § 55-c does not change, as a "brewer" is defined under the statute as the entity in the supply chain "who sells or offers to sell beer to a beer wholesaler" (id. § 55-c[2][b]).
Defendants' Contentions Regarding Alternate Remedies
For the foregoing reason, we are also unpersuaded by the defendants' contention that the proper party against whom the plaintiff should seek redress is OBC, the manufacturer. The defendants' reasoning is that OBC is responsible for the termination of its import and export agreement with BWS, which in turn led to the de facto termination of BWS's wholesale distributor relationship with the plaintiff. While the availability of a remedy against OBC is not a question squarely before this Court in the present appeal, we note that there is reason to doubt the availability of the remedy which the defendants contend the plaintiff should have pursued. "[A] brewer falls outside of the reach of [the Alcoholic Beverage Control Law] unless it 'sells or offers to sell beer' to a wholesaler" in New York (Amtec Intl. of NY Corp. v Polish Folklore Import Co., 2023 WL 2734642, *2, 2023 US Dist LEXIS 56803, *4 [ED NY, 20CV3 (LDH) (PK)]; see Alcoholic Beverage Control Law § 55-c[2][b]; see also Amtec Intl. of NY Corp. v Polish Folklore Import Co., 2022 WL 992565, *5, 2022 US Dist LEXIS 60236, *16 [ED NY, No. 20CV3 (LDH) (PK)]). Here, the available record does not resolve whether OBC sells or offers to sell beer to wholesalers in New York.
Termination of an Agreement
The defendants further contend that KP had no "agreement" with the plaintiff that KP could improperly terminate, as the plaintiff's agreement was with the prior importer. The defendants also contend that KP did not "terminate" the agreement that the plaintiff had with the prior importer, because the plaintiff's agreement de facto ended as a result of the manufacturer terminating its own agreement with the prior importer, and KP played no role in that termination.
These contentions also fail. Under subdivision 4 of the statute, a successor to a brewer is not merely prohibited from terminating an agreement, but also from failing to renew one (see Alcoholic Beverage Control Law § 55-c[4]). Moreover, the subdivision speaks of termination, nonrenewal, or cancellation of "an agreement," without reference to which entity originally entered into the agreement. Nothing in these subdivisions provides that the restrictions set forth in subdivision 4 apply only to the "brewer" who originally entered into the agreement. In fact, such a reading would render nonsensical the inclusion of "successor to a brewer" within the definition of "brewer." If only the original brewer who entered into the agreement could be sued for later terminating or failing to renew that agreement, then there would be no circumstances under which [*8]the statute would ever be applied to a "successor to a brewer."
Alcoholic Beverage Control Law § 55-c Cause of Action
Therefore, based on all of the foregoing, the Supreme Court erred in granting that branch of the defendants' motion which was for summary judgment dismissing the cause of action to recover damages for violation of Alcoholic Beverage Control Law § 55-c. For the same reasons, the court erred in denying the plaintiff's cross-motion for summary judgment on the issue of liability on that cause of action.
Remaining Causes of Action
However, the Supreme Court properly granted that branch of the defendants' motion which was for summary judgment dismissing the cause of action to recover damages for tortious interference with contract (see generally Grocery Leasing Corp. v P & C Merrick Realty Co., LLC, 197 AD3d 628, 629). The plaintiff did not establish that this branch of the defendants' motion was premature, as the plaintiff failed to demonstrate that additional discovery might lead to relevant evidence or that the facts essential to oppose that branch of the motion were exclusively within the knowledge and control of the defendants (see Mauro v City of New York, 204 AD3d 777, 779). Beyond the plaintiff's speculation, there was no suggestion made in the complaint or any of the other submissions that either KP or Northern intentionally induced BWS to breach its agreement with the plaintiff.
The Supreme Court also properly granted that branch of the defendants' motion which was for summary judgment dismissing the cause of action to recover damages for unfair competition (see Krinos Foods, Inc. v Vintage Food Corp., 30 AD3d 332, 333; see generally Allied Maintenance Corp. v Allied Mech. Trades, 42 NY2d 538, 543; White Studio, Inc. v Dreyfoos, 221 NY 46, 49). The plaintiff's allegations that KP chose to do business with another wholesaler, Northern, in violation of Alcoholic Beverage Control Law § 55-c, do not establish that the defendants misappropriated the plaintiff's skill, labor, or expenditures (see Krinos Foods, Inc. v Vintage Food Corp., 30 AD3d at 333-334), engaged in conduct that was likely to deceive or confuse the public into believing that the plaintiff's business or services were their own (cf. Allied Maintenance Corp. v Allied Mech. Trades, 42 NY2d at 543; White Studio, Inc. v Dreyfoos, 221 NY at 49), or "wrongfully diverted the plaintiffs' business to themselves" (cf. Robert I. Gluck, M.D., LLC v Kenneth M. Kamler, M.D., LLC, 74 AD3d 1166, 1166).
Conclusion
Accordingly, the order is modified, on the law, by deleting the provision thereof granting that branch of the defendants' motion which was for summary judgment dismissing the cause of action to recover damages for violation of Alcoholic Beverage Control Law § 55-c, and substituting therefor a provision denying that branch of the motion, and by deleting the provision thereof denying the plaintiff's cross-motion for summary judgment on the issue of liability on the cause of action to recover damages for violation of Alcohol Beverage Control Law § 55-c, and substituting therefor a provision granting the cross-motion; as so modified, the order is affirmed insofar as appealed from.
DUFFY, J.P., CHRISTOPHER and WARHIT, JJ., concur.
ORDERED that the order is modified, on the law, (1) by deleting the provision thereof granting that branch of the defendants' motion which was for summary judgment dismissing the cause of action to recover damages for violation of Alcoholic Beverage Control Law § 55-c, and substituting therefor a provision denying that branch of the motion, and (2) by deleting the provision thereof denying the plaintiff's cross-motion for summary judgment on the issue of liability on the cause of action to recover damages for violation of Alcohol Beverage Control Law § 55-c, and substituting therefor a provision granting the cross-motion; as so modified, the order is affirmed insofar as appealed from, with costs to the plaintiff.
ENTER:
Darrell M. Joseph
Acting Clerk of the Court

Footnotes

Footnote 1: Specifically, in Oak Beverages v Heineken USA, Inc. (Sup Ct, Orange County, Jan. 12, 2001, index No. 7757/00), the court denied a wholesaler's request for preliminary injunctive relief, without requiring that the supplier meet the statutory burden of proof as to whether its consolidation policy met the criteria established by the Legislature (see Introducer's Mem in Support, Bill Jacket, L 2001, ch 346 at 4).